# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 7, 2008

## STATE OF TENNESSEE v. CHRISTOPHER M. BLACK

### Direct Appeal from the Criminal Court for Davidson County
### No. 2004-A-246    Monte D. Watkins, Judge

### No. M2007-00970-CCA-R3-CD - Filed February 26, 2010

Defendant-Appellant, Christopher M. Black, was convicted by a Davidson County Jury of two counts of aggravated rape, a Class A felony, and two counts of aggravated robbery, a Class B felony. For each aggravated rape conviction, Black received a twenty-year sentence to be served consecutively to one another. For each aggravated robbery conviction, Black received a ten-year sentence to be served concurrently with one another. The trial court ordered the aggravated rape sentences to be served consecutively to the aggravated robbery sentences, for an effective sentence of fifty years.[1] On appeal, Black argues that (1) the evidence was insufficient to support his convictions; (2) the prosecution failed to establish a legitimate chain of custody for the evidence swabs collected from the crime scene; (3) it was constitutionally improper to allow a witness, Dwight Brewer, to identify Black at trial; (4) it was improper to admit proof of the original "CODIS hit" without establishing a chain of custody; and (5) the imposition of consecutive sentencing was improper. We affirm Black's convictions but remand for a resentencing hearing regarding Black's sentencing status with respect the 2005 sentencing act and regarding the issue of consecutive sentencing.

### Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Resentencing

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Richard Tennent, Nashville, Tennessee, for the Defendant-Appellant, Christopher M. Black.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth Bingham Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Deborah Housel and Roger Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

---

[1]On May 3, 2007, the trial court entered a corrected judgment to reflect that the defendant is to receive community supervision for life.

**Trial.**  This case stems from a brutal attack upon a female victim, L.P., and a male victim, D.B., beginning in the late hours of February 12, 1999, and ending in the early morning hours of February 13, 1999.  The victims had been friends for several years.  Around 11:30 p.m. on the night of the offense, the female victim drove to the male victim's parent's home where the male victim lived to borrow a movie.  She pulled her vehicle in front of his home and paged him to come outside.  The male victim came outside, gave her the movie, and sat inside her vehicle to talk.  About fifteen minutes later, the male victim was getting out of the vehicle when he and the victim saw two men with hoods coming through his yard.

The female victim stated that the two men came around from behind her vehicle, over to the driver's side, and knocked on the window.  Neither victim knew the two men.  The female victim cracked the window, and a revolver was stuck in the window to her temple.  The men screamed at the female victim, "Get out of the car, bitch.  Get out of the car bitch."  The vehicle was still running, and she unlocked the door and opened it.  The female victim said that a chrome revolver was put to her head.  She stated, "[I]t looked like it had a pearl, or like, an engraved handle.  Looked more like a collector's gun."

When the female victim began to get out of the vehicle, the men pushed her back inside.  At this point, she stated that she was in the front seat of her vehicle.  The male victim had gotten out of the vehicle and was on the ground.  The men went through the vehicle and told the victim they wanted her wallet and money.  She told them that she only had ten dollars, and they yelled at her for not having more money.  The men looked through the trunk twice and took the female victim's credit cards.

 The female victim differentiated between the two men by their skin tone.  After the men asked for the female victim's money, the female victim stated that the man with the dark complexion demanded that she perform oral sex on him.  She testified that he said, "'[Y]ou're going to suck my d***.'"  She said that she complied because she had a gun to her head and was terrified.  She stated, "It started in the street.  He made me get on my knees in the street and perform oral sex.  And they both switched back and forth between four to six times."  Both men forced her to perform oral sex against her will and consent by threatening her with a weapon.

The female victim testified that after the men forced her to perform fellatio on them, the man with the lighter complexion said, "'I want to f*** this b****.'  And they made [her] pull down [her] pants and bend over in the street.  And they took turns raping [her] from behind."  When one man was raping her, the other was watching for oncoming cars.  After being vaginally raped, the female victim was forced back inside the car to perform oral sex.  Initially, the female victim could not recall if either man ejaculated.  However, she later stated that, at some point, one of the men ejaculated in her mouth. She could not recall where

she was physically positioned but she gagged, and spit the ejaculate outside the vehicle on the pavement of the street.

The female victim recalled that the male victim begged the men to stop. The men began to leave, but came back. They ordered the male victim to run down the street while they held the female victim by her hair at gunpoint. The men then pushed the female victim, and told her to run and not to look back. The female victim found the male victim, and they ran down the street knocking on doors until someone gave them a phone to call 911. The male victim's father came to pick them up and later took them to the crime scene to wait on the police. When the female victim returned to the scene, her vehicle was still there with the four doors open.

At trial, the female victim identified photographs from the crime scene. She specifically identified a photograph of the ejaculate that she spit out onto the pavement. It was admitted into evidence as collective exhibit 1G. She recalled that the police officers marked exhibit 1G as significant. She described both men as in their early twenties. She also estimated that the attack lasted around thirty to forty-five minutes. She stated that the men were dressed alike. They wore masks, black jeans and sweatshirts, but one man had on a red shirt and the other a blue shirt. The man with the blue shirt had a dark complexion and the man with the red shirt had a light complexion.

The female victim was not missing any of her credit cards, but the men took her ten dollars. She told the police what happened and was given a gynecological examination that night. The police obtained internal vaginal swabs and swabs of her mouth. A black light was placed over her naked body to determine the existence of any pubic hairs or semen. The police also took the female victim's clothes. The female victim stated that she did not discuss what she was going to tell the police with the male victim.

The female victim recalled that, at some point, the two men took their masks off. However, she could only remember seeing the lighter complected man's face. She and the male victim provided the police with a sketch; however, she had no input in the sketch developed by male victim. She stated that she did not remember anything about the man with the dark complexion.

On cross-examination, the female victim acknowledged that she had trouble remembering the sequence of events; specifically, whether she was forced to perform oral sex or was vaginally raped first. In regard to the events leading up to the man's ejaculating in her mouth, she said she could not remember whether both men or only one man forced her to perform oral sex. She further conceded that she was unsure if the man with the lighter complexion ejaculated in her mouth. She also admitted that she had previously misidentified a busboy that she saw at a restaurant from a photographic lineup as the man with the lighter complexion. This photographic lineup was admitted into evidence as exhibit 8.

The female victim explained that the attack occurred in a residential neighborhood and that the area was illuminated by the headlights on her vehicle and by various streetlights. She recalled that the inside of the vehicle was illuminated from the dash board. She explained that the men wore masks when they pistol-whipped Brewer but took them off during the rape. She had no memory of either man wearing gloves but stated that both men held her credit cards in their hands.

The male victim testified and corroborated the female victim's testimony. He explained that when he went outside to meet her that night, everyone else inside his house was asleep. He stated that the men took his coat, which contained his wallet and $350. He also had a "stereo face" inside his coat pocket. The two men also took his earrings, skull cap, and tennis shoes. He noticed that the men had a silver weapon, and he saw one of the men forcing the victim to perform oral sex on him.

The male victim also distinguished the men by skin tone and said that the man with the dark complexion had the gun. He saw the darker complected man, whom he later identified as Black, forcing the victim to perform oral sex on him. The male victim confirmed that the man with the dark complexion also hit him in the back of the head with the gun. He went to the hospital and received nine stitches to the head and had a scar as a result. He provided a statement to the police and worked on a sketch that same day. The male victim said that he worked on the sketch which was admitted into evidence as exhibit 2-A. When the sketches in this case were developed, the male victim and the female victim were not in the same room.

The male victim identified Black as the person he saw forcing the female victim to perform oral sex on him from a photographic lineup, which was admitted into evidence as exhibit 4. The male victim testified that it was "the eyes" that stood out to him. He said that the man was younger than he, 5'10" tall and 130 pounds. He admitted that he had previously been confused about whether Black wore a red shirt or a blue shirt but said he was certain of his identification.

On cross-examination, the male victim stated that his credit card was used at a gas station and two other stores within thirty minutes of the offense. He conceded that in two prior photographic lineups, he identified another individual as someone who "looked like" the dark complected man. He clarified that in each of those lineups, he told Detective Sutherland that he "wasn't one hundred percent sure" or was "not positive" of the identification. Four years after the initial photographic lineups, the male victim was brought in to view another photographic lineup. Detective Sutherland told him he had a possible suspect and that there was a DNA match. The male victim testified that when he identified Black from the photographic lineup, Detective Sutherland told him that he had chosen the person confirmed by DNA analysis.

The male victim's sister testified that she was at home on the night of the offense. She heard noises outside and heard someone say "Make those 'hos run." She woke her father, went outside, and noticed the female victim's vehicle in front with the doors open and things on top of the roof. There was no one around at the time. She called the non-emergency number, and she and her father closed the doors to the vehicle. She later received a call from a neighbor indicating the female victim and her brother were there and had been hurt. She went inside to upgrade her previous non-emergency call to a 911 call.

Michael Evans, a ten-year veteran with the Metro-Nashville Police Department, was one of the first officers to respond to the scene on the night of the offense. He secured the crime scene, blocked one of the side roads, and called the "ID division" because it was a major crime. He received a description of the suspects from the male victim and put out a "BOLO" or "be on the look-out" announcement containing the male victim's description of the two men involved in the offense. He was told that one of the men had on blue jeans, not black jeans. He was also told that one of the men had on a red pullover sweater, not a red t-shirt and a black pullover sweater. He was further told that the other man wore a blue pullover sweater and blue jeans.

Johnny Lawrence, an officer with the Technical Investigation Division (TID) of the Metro-Nashville Police Department, testified that he responded to the crime scene on the night of the offense. He did not completely examine the vehicle at the scene that night. However, he took the vehicle to another location to be processed. All of the items at the scene were collected by Officer Lawrence. He stated that he collected evidence of bodily fluid off the roadway, which was located near the center of the street on the driver's side of the vehicle, and was visible to the naked eye. Officer Lawrence photographed the substance and obtained samples of the evidence. At trial, he explained his efforts to collect this evidence:

> I attempted to pick some of it up with what we call a filter paper. We use that to do rugs with, mainly with blood. I also use them to collect hair samples and items. But I tried to rub the stain to try to pick it up, because it was such a broad area, but I tore the paper doing that. So, then, I used cotton swabs with distilled water, so I could pick it up and get a better collection of it.

Officer Lawrence identified an evidence bag with the number 9972874 as the original bag in which he placed the evidence swabs collected from the crime scene. He stated that the bag also contained filter paper and swabs. He observed that other people had placed their initials on the bag, which indicated that the contents had been processed or examined. He turned the evidence bag over to the "refrigeration" unit, specifically Brad Johns, a detective in the homicide unit. He had no further contact with the evidence. The bag was admitted into evidence as part of collective exhibit 11.

Officer Lawrence acknowledged on cross-examination that although he normally puts his initials on evidence bags, this bag did not contain his initials. He confirmed that the handwriting on the bag was his. He further stated that he wrote the complaint number, date, time, location, and a description of the evidence swabs on the evidence bag. On re-cross examination, he stated he may have forgotten to put his initials on the bag but affirmed that he turned the evidence over to Detective Johns. The state admitted exhibit 15, entitled "Supplemental Report," in support of Officer Lawrence's testimony. Exhibit 15 was a typed report containing the victim's name, the date of the instant offense, and complaint number 9972874. Exhibit 15, which was signed by Detective Brad Johns, stated the following:

> At approximately 0220hrs on February 13, 1999, ID Officer Lawrence gave me a bag containing swabs that he took from the street near [the offense location]. These swabs were put in the drying box by myself, and an evidence tracking form was started on these items.

At the time of the offense, Detective Brad Johns was assigned to the homicide unit. He testified and confirmed that he obtained the bag of evidence from Officer Lawrence from the crime scene in the instant case. He said that he stood in front of Officer Lawrence and watched him fill out the time the evidence was collected, the contents of the bag, and the complaint number. Detective Johns opened the evidence bag and saw that it contained three swabs and one cloth. He carried that bag of evidence to the property room and placed it in the drying cabinet for storage. He filled out exhibit 14, an evidence tracking form which showed the chain of custody, and exhibit 15, the supplemental report of the evidence. He verified that he locked the storage cabinet and gave the key to Detective Steve Cleek that morning.

Steve Cleek was a detective in the homicide unit at the time of the offense. He did not go to the crime scene but became involved in the chain of custody. Detective Cleek said that Detective Brad Johns had a rape kit, put it in an air-drying box, and gave him the key to the box because Detective Johns was not working the next two days. Detective Johns gave Detective Cleek the key to the box to give to the detectives in the sex crimes unit. Detective Cleek testified that he gave the key to Detective Sutherland. Exhibits 20A and 20B, reports by Detective Cleek, were admitted into evidence in support of his testimony.

Phillip Sage, a sergeant with the Metro-Nashville Police Department property room, testified that only police officers and employees have access to evidence kept in the property room warehouse. He described a sheet of paper which documented the police department custody of the evidence in this case. The sheet was admitted into evidence as exhibit 19. Exhibit 19 showed that on April 15, 1999, Mary Wilhoite and Mike Nichols took the rape kit from the property room to the Tennessee Bureau of Investigation (TBI) crime lab. On August 17, 1999, Detective Sutherland returned the evidence to the property room from the crime lab.

Sandy Myers, a nurse practitioner at the Nashville General Hospital, testified regarding the medical legal exam (MLE) performed on the female victim. Myers stated that she had previously conducted over 500 MLE's and was tendered as an expert in the field of medical legal examination. Myers also testified as the records custodian for the hospital and explained the female victim's rape report. The report showed the areas of contact as the mouth, the vulva, and the vaginal area. It corroborated that the perpetrator ejaculated on the street and was consistent with the female victim's being sexually penetrated. The report further indicated that the perpetrator did not wear a condom, and swabs from the rape kit tested negative for sperm. The report was admitted into evidence as exhibit 16, and the rape kit was admitted into evidence as exhibit 17.

Myers stated that the kit was not retrieved by the police that night. She explained that in such cases, the kit is locked in a cabinet specified for MLE's. She then verified that exhibit 16 showed that the kit was locked in the cabinet at 4:01 a.m. on the night of offense and released at 8:00 p.m. the same day to Detective Sutherland. Based on exhibit 18, another hospital report, Myers stated that Black was brought to the hospital on September 22, 2003, to have his blood drawn. Exhibit 18 showed all of Black's identifying information including his name, date of birth, and social security number.

Detective Keith Sutherland was assigned to this investigation; however, he did not go to the crime scene or collect any evidence. He relayed the BOLO's, took written statements from the victims, scheduled the sketch with the victims, and arranged for a time for the victims to review composites. Detective Sutherland testified that Officer Lawrence had collected certain evidence which was secured in a drying box in the property room. Detective Cleek gave him the key which contained the swabs that were taken from the crime scene. He stated that he went to the hospital to retrieve the rape kit on February 15, 1999. The kit was sealed, and Detective Sutherland did not observe anything unusual about it. Detective Sutherland confirmed that it was his signature on exhibit 16, the hospital report, showing that he obtained the rape kit. On February 18, 1999, Detective Sutherland took the rape kit and placed it in the property room inside the drying cabinet, with the exception of the blood sample which he placed in the refrigerator. Detective Sutherland stated that he did not add anything to the rape kit or the bags containing the swabs recovered from the scene. He later took the evidence from the property room to the crime lab. Detective Sutherland conceded that he mistakenly wrote victim/MLE instead of subject/MLE on the TBI request to examine blood from another suspect. He also explained the fingerprint analysis did not result in a match with Black.

Detective Sutherland stated that he entered the female victims' description of the perpetrators in the computer in order to develop the photographic lineup. As a result, the computer generated a pool of people. Detective Sutherland additionally explained that unlike the computer generated photographs, he had to get a photograph of the busboy that the female victim initially believed was involved in the offense from the Department of

Transportation. He confirmed that the female victim initially identified the busboy as the perpetrator. Other than a telephonic interview wherein the busboy denied involvement in the offense, Detective Sutherland did not do any further investigation regarding the busboy. Detective Sutherland also stated that he did not investigate the charges on the male victim's credit card because he believed that any surveillance tapes that existed at the time of the offense had already been taped over due to the passage of time.

Detective Sutherland received exhibit 22, a serology report dated July 19, 1999, from Agent Minor stating that sperm and semen were present on the evidence swabs taken from the crime scene. Exhibit 22 provided that DNA analysis could be performed upon receipt of a subject blood standard and a request from the district attorney general. On December 27, 2002, Detective Sutherland filled out a re-submittal form requesting Agent Minor to compare another suspect's DNA with the DNA located at the crime scene and to enter the results into the Combined DNA Index System ("CODIS").[2] Detective Sutherland said that he physically checked exhibit 11 out of the property room and took it to the TBI crime lab. He stated that he did not manipulate the evidence in any way.

Exhibit 36, another serology report, was dated August 20, 2003. Based on exhibit 36, the suspect's blood that Detective Sutherland sent for analysis did not match the DNA recovered from the crime scene. However, Detective Sutherland received Black's name from Agent Minor as a potential match from the CODIS database. Detective Sutherland subsequently obtained a search warrant for a sample of Black's blood. He also observed the blood sample being drawn from Black and physically took the blood sample to the TBI. Exhibit 29 was admitted into evidence and was described as a box containing vials of Black's blood. After receiving confirmation that Black's blood sample matched the DNA from the semen located at the crime scene, Detective Sutherland obtained a warrant for Black's arrest.

Following the DNA confirmation, Detective Sutherland set up a photographic lineup with the male victim. He did not tell the male victim anything prior to the viewing. Specifically, Detective Sutherland informed the male victim that he wanted to set up another photographic lineup "due to a CODIS hit – I don't know that I went in to detail." Detective Sutherland said that the male victim picked Black "almost immediately" from the photographic lineup.

Detective Sutherland acknowledged that a second vehicle in Brewer's driveway had been touched by the perpetrator, but no fingerprint analysis had been performed. He also confirmed that none of the fingerprints lifted from the scene belonged to Black. Detective Sutherland further conceded that in the photographic lineup containing Black, the

---

[2] CODIS is a local, state, and national database of DNA profiles collected from crime scene evidence as well as convicted offenders.

background of Black's photograph was blue while the background of the other photographs was brown. He also admitted that there was no documentation of the location of the rape kit between February 18 and February 23. He stated that "[t]he custody of this would have been, either, one, locked in my office; or , two, locked in . . . the drying box, along with the large bag of clothing we just discussed." Detective Sutherland said that he did not break the rape kit down, but he did take the blood sample out and place it in the refrigerated cabinet. He conceded that this action was not documented.

Joe Minor, a forensic scientist for twenty-three years and a special agent with the TBI crime laboratory, testified that he was the Nashville DNA supervisor. He was originally provided with evidence from the crime scene in the instant case in April 1999. The items submitted to the crime lab included a vial of the female victim's blood, saliva and vaginal swabs, and a brown bag containing three evidence swabs. All of the items were brought into the lab on April 15, 1999, by Mary Wilhoite. He also received the evidence from the MLE on the victim. He examined (1) the vaginal swabs, (2) the oral swabs, (3) the evidence swabs, and (4) the TBI bloodstain card containing the victim's blood sample. He retrieved the MLE kit from the evidence vault, recorded the time, and took it back to his work area. He then broke the seal from the Metro Police Department to perform his examination. His file noted that he received the kit "sealed with blue evidence tape."

In Agent Minor's first report, there was no exam performed on the female victim's DNA. He explained that TBI's policy at that time was not to perform an exam when there was no suspect blood standard unless there was a request from the district attorney. Regarding the vaginal swabs, Agent Minor observed the presence of both sperm and semen. No sperm was present on the oral swabs. However, the swabs containing the bodily fluid collected from the street tested positive for sperm, and Agent Minor took additional cuttings for later DNA comparison and testing. Agent Minor placed the evidence back in the box, and sealed it with tamper proof tape.

When he received the re-submittal form, Agent Minor performed DNA analysis from the semen on the evidence swab against the requested suspect. The comparison was not consistent with the DNA from the semen recovered from the crime scene; however, it did show an unknown male profile which enabled Agent Minor to run that profile in the CODIS database. As a result of the unknown male profile, Agent Minor received a "CODIS hit" on the defendant, Christopher Black. Agent Minor stated that when the box containing the rape kit was returned to him, it was sealed with his original TBI tape. Agent Minor broke the seal to get into the box, and took the evidence swabs out. He obtained a complete profile from the evidence swabs.

Agent Minor explained that exhibit 26 was the re-submittal form for the female victim's rape kit. The evidence from the kit that was tested in 1999 was re-submitted in 2002.

He further stated that exhibit 35 was a copy of the report with his additions to it. Agent Minor stated:

> So, the first time . . . that I got [the rape kit] in 1999 it had been sealed. When I received it for DNA analysis I broke my own seals, took the evidence out, set it up for DNA analysis. And then at the conclusion resealed it with the evidence tape. . . . So, it was initially sealed. It came in sealed. I returned it sealed, and taped again.

Agent Minor then provided detailed testimony on his search of the DNA database called CODIS that contained DNA profiles.

Agent Minor stated that although he received a CODIS "hit" on Black, he needed an actual blood sample from Black to confirm the CODIS hit. He received a blood sample from Black on September 23, 2003. Agent Minor stated that he developed a profile based on Black's blood sample and that Black's profile "matched" the evidence swab collected from the rape kit containing the semen. Agent Minor testified that the word "match" meant that the numbers that are the actual allele types in the DNA profile. He explained that "for those thirteen locations, every one of those numbers are the same." He further stated that the probability that it was not a match in the Caucasian population is one in sextillion, and in the African American population it was one in thirty-nine sextillion. He testified that the probability that it could be someone other than Black exceeded the world's population by "at least a million times over[.]" In conclusion, Agent Minor opined that there was no one else on earth who would have the same profile.

On cross-examination, Agent Minor acknowledged a typographical error in the report as to the date the evidence was received.

**I**. **Sufficiency of the Evidence.** Black argues the evidence was insufficient to support his convictions. Specifically, he claims that no rational juror could accredit the male victim's identification or trust that Detective Sutherland properly preserved the evidence swabs. The State contends the direct evidence was more than sufficient to warrant the jury's guilty verdict.

We resolve this issue by recognizing the well-settled rule that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this Court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 442 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions

whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 923 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

As pertinent to this case, section 39-13-502 provides:

(a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

T.C.A. § 39-13-502; see also State v. Dominy, 6 S.W.3d 472, 479 (Tenn. 1999).

Additionally, to convict Black of aggravated robbery, the State was required to prove that he used a deadly weapon to commit an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A § 39-13-401, -402.

Black does not dispute that the crimes charged in this case occurred. He challenges the sufficiency of the convicting evidence by attacking the credibility of two witnesses, D.B., the male victim, and Detective Sutherland. The male victim was extensively cross-examined at trial regarding the photographic lineup procedure and his identification of Black as one of the perpetrators of the crimes. Based on the record, the male victim did not identify with certainty either person in the two prior photographic lineups because he "wasn't one hundred percent sure" or was "not positive" about those identifications. However, he identified Black

"immediately" in the photographic lineup. When asked whether he was sure of his identification of Black as the perpetrator in the last photographic lineup, D.B. replied, "Yes." Detective Sutherland was also extensively cross-examined on how he handled the evidence swabs which ultimately connected Black to the crimes through DNA analysis. Detective Sutherland stated that he did not tamper with or alter the evidence in this case. In addition, there was substantial testimony in support of the chain of custody in this case. Each of the arguments Black offers in support of this issue was presented to and rejected by the jury. As previously stated above, it is for the jury, not this court, to decide what weight to give to the evidence and to determine the credibility of the witnesses. Moreover, the DNA analysis in this case established that the probability that the perpetrator was someone other than Black exceeded the world's population by "at least a million times over[.]" Based on all the evidence, we conclude that a rational trier of fact could have found that Black was the perpetrator of the crime. Black is not entitled to relief on this issue.

**II. Chain of Custody.** Black argues that the prosecution failed to establish the chain of custody for the evidence swabs containing the sperm collected from the crime scene that led to the DNA match. In response, the State contends the trial court correctly ruled that the State had established a sufficient chain of custody for this evidence.

In order to admit physical evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998) (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)). Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, "and the court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion." Id. at 701 (citing State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). On appeal, challenges to the integrity of the chain of custody of evidence are reviewed for an abuse of discretion. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); Beech, 744 S.W.2d at 587. Under this standard, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 901(a) requires that evidence be authenticated or identified as a condition precedent to its admissibility. Tenn. R. Evid. 901(a). This court has previously held that for tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing Goodman, 643 S.W.2d at 381). The purpose of this requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993) (citing Orr v. State, 472 N.E.2d 627, 630 (Ind. App. 1984)). Absolute certainty of identification is not required, however. See

<u>Kilpatrick</u>, 52 S.W.3d at 87 (citing <u>Ritter v. State</u>, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." <u>Id.</u>

In addition, the Tennessee Supreme Court has observed:

Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means.

<u>Cannon</u>, 254 S.W.3d at 295-96 (internal citations and quotation omitted).

Black argues that the trial court abused its discretion in admitting the evidence swabs containing his DNA. He argues the chain of custody was not sufficiently established because (1) Officer Lawrence testified on cross-examination that he individually packaged each evidence swab in a paper sack and that he normally would have placed his initials on the bag; (2) the State failed to introduce documents pertaining to the swabs; namely, the "sheet of paper" that showed the evidence swabs had been received by the property room; and (3) there was no documentation of (a) when the swabs were added to the MLE rape kit, (b) where the swabs were located between removal from the drying cabinet and placement into the MLE rape kit, or (c) where the evidence swabs were located for the twenty-four hour period between the time that Detective Sutherland retrieved them from the property room and the time that he delivered them to the TBI laboratory for re-examination. In response, the State contends the trial court did not abuse its discretion in finding that the State had sufficiently established the chain of custody and in admitting the evidence swabs. We agree with the State.

The record reflects that Officer Lawrence collected all of the evidence, including the swabs from the crime scene. He identified "the original bag" in which he placed the evidence swabs. When he identified the bag, it had been processed or examined by other people. He stated that Exhibit 11, the bag containing the evidence swabs, was placed into the "refrigeration unit" and later turned over to Detective Brad Johns. Detective Johns stated that he obtained a bag of evidence from Officer Lawrence from the crime scene. He carried that bag of evidence to the property room and observed Officer Lawrence place the time the

-13-

evidence was collected, the contents of the bag, and the complaint number on the bag. Detective Johns also opened the bag, noted that it contained three swabs and one cloth, and put the bag in a locked drying cabinet for storage. He filled out an evidence tracking form showing the chain of custody which was admitted as exhibit 14. The key to the unit was given to Detective Cleek that morning. Detective Cleek testified that he gave the key to the storage cabinet to Detective Sutherland.

Detective Sutherland testified that he received the key to the evidence, and did not manipulate the evidence in any way. Detective Sutherland further testified that he obtained the evidence containing the swabs collected from the crime scene and personally delivered it to the TBI crime laboratory. Agent Minor testified that he received the evidence in "sealed condition." The gravamen of Black's argument is that there was not written documentation of some of the links in the chain of custody. However, the State was not required to provide such documentation, and in each instance there was sufficient testimony regarding the status of the evidence.

Black additionally implies that the chain of custody for the evidence swabs was compromised because Officer Lawrence stated that he individually packaged each evidence swab in a paper sack, and Detective Johns stated that he received the swabs together in one bag. We are not persuaded that this testimony alone compromised the chain of custody. In our view, the facts and circumstances surrounding the evidence swabs reasonably established their identity and integrity. Accordingly, the trial court did not abuse its discretion, and Black is not entitled to relief on this issue.

**III. Identification of Black.** Black contends that it was constitutionally improper to allow the male victim to identify him at trial in light of the inherent suggestiveness of the photographic lineup, the lead detective's improperly suggestive actions, and the factual uncertainty of D.B's identification.

"On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress." State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). In conducting our review, it has long been settled that "[f]indings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (quoting State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In addition, the Tennessee Supreme Court has stated:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the

strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23.

Our analysis of this issue is based upon the United States Supreme Court holdings in Simmons v. United States and Neil v. Biggers. In Simmons, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968). In Neil v. Biggers, the Court established a two-part analysis which the trial court must apply to determine the validity of a pre-trial identification. 409 U.S. 188, 198-99, 93 S. Ct. 375, 381-82 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198, 93 S. Ct. at 381-82. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199, 93 S. Ct. at 382. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in Biggers if the trial court determines that the identification procedure was not unduly suggestive. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

Here, the trial court granted Black's motion to suppress in part and denied his motion in part. Specifically, the female victim's in-court identification of Black at the arraignment was excluded because she identified someone other than Black in the photographic lineup. However, the trial court stated, "The photo lineup identification by [the male victim] was not suggestive. Since the procedure was not unduly suggestive, the Court does not need to delve into the second prong of the Biggers analysis." The trial court reasoned:

There is nothing in the proof or testimony presented at the suppression hearing that Detective Sutherland's actions throughout the identification process were improper. Secondly, this Court has thoroughly scrutinized the exhibits presented in this case, particularly the photographic lineup sheets. There is nothing in these photographs that indicates a gross dissimilarity to the Court.

The trial court denied the motion to suppress the male victim's identification of Black, finding that "[t]he individuals depicted in each of the photo lineups are all similar in appearance to each other."

-15-

Based on our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup or the overall identification process. The photographic lineup contains photographs of six African American males, all of whom had a bald head and a goatee. Each photograph is uniform in size. Except for one person, all, including Black, wore dark-colored clothes. Moreover, despite the difference in the background color, nothing about Black's photograph was "grossly dissimilar" to the others in the photographic lineup. We also do not consider Detective Sutherland's statements to the male victim that there was "a possible suspect" or "a DNA match" or "a CODIS hit" prior to viewing the photographic lineup as unduly suggestive. Accordingly, the trial court did not err in denying Black's motion to suppress.

**IV. <u>Admission of "Codis Match" Testimony.</u>** Black claims that it was improper to admit proof of the original "CODIS match" or hit between his DNA and the crucial evidence swabs because there was no chain of custody establishing his DNA as the source of the match. The State argues that Black failed to preserve this issue by lodging a contemporaneous objection to Agent Minor's testimony; therefore, this issue is waived.

Here, the record clearly shows that this issue was properly preserved by pre-trial motion and objection. Prior to Agent Minor's testimony, defense counsel filed a motion in the first trial in this case, requesting that the trial court exclude testimony regarding a CODIS match. The trial court allowed the State to "allude to the hit, only in the sense that his name came up, not to say you had a prior DNA on Christopher Black." Following Agent Minor's testimony in the instant case regarding the discovery of an unknown male profile, the prosecutor questioned, "And was there a match?" Agent Minor replied, "Yes." One question later, defense counsel asked to approach the bench and stated, "Again, I thought it was going to be consigned to DNA hit as a possible subject. What I heard out there was 'DNA match.' I keep saying we don't have a chain of custody on whatever blood we use to do a match." Agent Minor was then counseled not to use the word "match" regarding the CODIS report. He then advised that the CODIS report actually used the term "match" but would comply with the court's instruction.

Prior to the State admitting exhibit 36, the report showing the CODIS information, into evidence, defense counsel objected and stated:

> At pre-trial last time I objected to all CODIS, because there is no chain of custody on Christopher Black's blood. So anything [that] has to do with this is based on zero chain of custody, I would proceed – the prior ruling was they can say 'hit.' So, I don't object to 'CODIS hit.' I do object, but I respect Your Honor's prior ruling.

The last full paragraph of exhibit 36, a two-page report, was redacted to read: "The above DNA profile was searched against the CODIS database and [blank space] was detected. To

confirm this [blank space] a liquid blood sample from Christopher Black must be submitted to the Nashville Laboratory for DNA testing."

Black correctly argues that there was no evidence supporting the chain of custody for the blood drawn to establish the CODIS "hit." However, based on the authority discussed in Issue II, we are not persuaded that such evidence was necessary for exhibit 36 to be properly admitted. Although it contained CODIS information, exhibit 36 was the serology report analyzing the female victim's DNA. The last paragraph provided that law enforcement had searched the resulting DNA profile against the CODIS database, and Black was developed as a suspect. Exhibit 36 specifically stated that a liquid blood sample from Black was necessary for DNA testing. As such, the CODIS information within the report was not intended to be used as confirmation of Black's DNA. Rather, the CODIS information in the report, which was testified to by Agent Minor, established a basis to request a liquid blood sample from Black. See People v. Johnson, 139 Cal.App.4th 1135, 1151 & n.17 (Cal. App. 5 Dist. 2006) (Proof regarding the chain of custody is not necessary where the CODIS match is used for further investigation, not as proof of an individual's guilt). In addition, Agent Minor testified that he compared Black's blood with the DNA profile developed from the evidence swabs taken from the scene. The chain of custody regarding the blood drawn from Black that was compared to the evidence taken from the crime scene, though not challenged, was proper. Accordingly, the trial court did not err in admitting exhibit 36.

**V. Consecutive Sentences**. Black argues the trial court erred in imposing consecutive sentencing because the court failed to make the requisite findings under State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). He further contends that the imposition of consecutive sentencing violates his rights under the Sixth Amendment.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant, not the State, has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d), Sentencing Commission Comments.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). In addition, the length of

a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2).

Although the offenses for which Black was convicted occurred before June 7, 2005, the effective date of the amended sentencing act, he was not sentenced until January 17, 2007. The record shows that the trial court sentenced him pursuant to the amended sentencing act. Defendants sentenced on or after June 7, 2005, for crimes committed before that date but after July 1, 1982, "may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections." T.C.A. § 40-35-210, Compiler's Notes. However, the record before us does not contain a written waiver.

At sentencing, there was confusion over which law was applicable. Defense counsel initially conceded that two enhancement factors applied. He further argued that "while there [were] enhancing factors, they [were] not significant enough to warrant a sentence any more than the middle of the range." The State replied:

> Based on what [defense counsel] said about starting at the bottom of the range, means that we're dealing with post Blakely sentencing and not presumptively it being twenty years. And that's fine, because that means the enhancement factors are guidelines, as opposed to being bound – so, no problem with that. I just wanted to make that clear.

Defense counsel then noted his disagreement with State v. Gomez [163 S.W.3d 632, 654-61 (Tenn. 2005) (Gomez I )], vacated and remanded, Gomez v. Tennessee, 549 U.S. 1190, 127 S.Ct. 1209 (2007), and argued that "these enhancement factors are unconstitutional in any advisory rule; and, my position as a matter of law [is] that unless a jury has found the enhancement factors that they cannot be relied on and he should be given the minimum sentence." After this discussion, the trial court stated that it could "use the enumerated enhancement factors as a guideline" and sentenced Black according to Tennessee's amended sentencing act.

Based on the above exchange, we must remand this case for the trial court to determine which law applies to Black's sentence. We note that under the prior law, Black's sentence may not be enhanced based upon judicially determined facts other than his prior criminal record. State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007). On the other hand, under the amended sentencing act, Black must execute a written waiver of his ex post facto rights, and the trial court must state on the record its findings in support of any enhancement it determines applies to the sentence. See State v. Mooneyhan, No. M2006-01330-CCA-R3-CD, 2007 WL 3227066, at *17-18 (Tenn. Crim. App., at Nashville, Oct. 30, 2007).

We further note that the trial court imposed consecutive sentencing based on Tennessee Code Annotated section 40-35-115(b)(4), "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Regarding this subsection, the Tennessee Supreme Court has stated:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

In regard to consecutive sentencing, the trial court's determination was limited to the following:

> In this particular case the Court does find that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation – had no hesitation about committing a crime in which the risks to human life was high. Again, a weapon was used.

We conclude that a remand is also necessary for the trial court to "specify the reasons" for its imposition of a consecutive sentence in this case and to make the additional factual findings required for the dangerous offender classification. See Tenn. R. Crim. P. 32(c)(1); see also Imfeld, 70 S.W.3d at 708. Accordingly, Black's convictions are affirmed, but the case is remanded to the trial court for a resentencing hearing, following the election by Black to proceed under either the pre-2005 sentencing act or the post-amendment act with waiver of ex post facto protections.

Finally, in regard to Black's challenge to the constitutionality of the consecutive sentencing statute and without engaging in a lengthy discussion, we note that the Tennessee

Supreme Court rejected an identical challenge in <u>State v. Allen</u>, 259 S.W.3d 671, 689 (Tenn. 2008). Accordingly, Black is not entitled to relief on this issue.

## CONCLUSION

We affirm Black's conviction and conclude that (1) the evidence was sufficient to support his conviction, (2) the chain of custody was properly established for the evidence collected from the crime scene as well as the blood sample collected from Black, (3) the male victim's identification of Black was properly admitted by the trial court, and (4) the trial court properly admitted proof of the original "CODIS hit." We affirm Black's convictions but remand for a resentencing hearing following Black's election to proceed under either the pre-2005 sentencing act or the amended sentencing act with waiver of ex post facto protections and regarding the issue of consecutive sentencing.

_____
CAMILLE R. McMULLEN, JUDGE